Essex County.Orphans Court—In re Mullen.

ESSEX COUNTY ORPHANS COURT.

In the matter of the estate of JAMES MULLEN, deceased.

**Administrators—Accounting—Exceptions for Alleged Failure of Accountant to Charge Herself With Rental Value of Certain Property and for Allowance Prayed for Services to Intestate's Wife as Housekeeper and Nurse.**

On exceptions to account.

*Mr. William A. Lord,* proctor for accountant.

*Mr. H. Edward Wolf,* proctor for the exceptants Roger and Helen Erben.

*Mr. Andrew R. Fitzsimmons,* proctor for the exceptant James Mullen.

KOCHER, ADVISORY MASTER.

James Mullen, late of the city of Orange, departed this life on the 30th day of September, 1918, intestate, and Annie A. Crotty, one of his daughters, was duly appointed administratrix of his estate and filed her account as such administratrix in this court. Exceptions to her account were taken by James Mullen, Jr., one of the children of the said James Mullen, deceased, and also by Frank J. Erben, guardian of Roger Erben and Helen Erben, minors, the children of a deceased daughter of the said decedent.

The first exception objects that the said administratrix has not charged herself with the fair rental value of certain lands and premises whereof the said James Mullen died seized. By their second exception, exceptants object to an item of $4,054, prayed allowance in said account for services rendered by the said Annie A. Crotty in doing housework and for nursing and caring for her mother, the wife of the said James Mullen, deceased, and also that said decedent

had never received the sum of $600 for the use of said accountant as prayed allowance for in said account.

In regard to the first exception, it is well settled that an administrator has no power whatever over the real estate of his intestate and is not accountable for rents in this court. If he collects rents or occupies premises of the decedent, the only forum in which he can be called to account is the court of chancery. *In re Struble's Estate, 87 N. J. Eq. 311.* This disposes of the first exception.

In order to dispose of the second exception, it is necessary to go into the history of the Mullen household from the date of Mrs. Crotty's marriage, on June 26th, 1907. Before her marriage, Mrs. Crotty, then Mullen, was living with her parents, and it appears that, after her marriage, her husband returned to Yonkers, where he was then employed, Mrs. Crotty remaining with her parents. Martin Crotty, the husband, testified that, upon his return to visit his wife, he met intestate, who remarked that he was sorry to lose his daughter, but he understood that her mother said that Annie (the daughter) was going to stay there, and that it was not so bad as long as she was going to stay and live there; that he understood that Mrs. Mullen, his wife, had said to Annie that as long as she was going to stay there and take care of her, the place was to be left to her, Annie, for such care, and that he wanted to know if he (the witness) was agreeable, and that, in reply, he said that he was working out of town and would like to go to housekeeping. Mr. Crotty further testified that the following arrangement was entered into: He and his wife were to have the use of the kitchen in which to prepare their meals, and four rooms in the house, for the monthly rental of $10, the Crottys to use the dining-room, while Mr. and Mrs. Mullen ate in the kitchen. The house was a one-family house.

At the time this arrangement was entered into, Mrs. Mullen was suffering from rheumatism, and needed some help and assistance; just how much, it is impossible to determine from the conflicting testimony. It is, however, perfectly safe to say that, at this period of time, she was able to move

about the house on crutches and perform most, if not all, of her work. Her ailment was apparently progressive, and she gradually required more and more assistance, but she was apparently able to get about and assist herself to a certain degree. In February, 1914, she suffered from a fall, which further incapacitated her, and after this she was unable to leave the second floor of the house; and while the testimony is in hopeless conflict, it would appear that she was still able to assist herself to a certain degree, until finally she became absolutely helpless and unable to leave her chair or assist herself in any manner. Just when this condition of affairs occurred it is impossible to determine, as the testimony is inextricably confused, various witnesses testifying that she was in this condition from one to three years or more prior to her death.

Accountant claims compensation for services in caring for her mother from July 26th, 1907, to September 30th, 1918, eleven years, three months and four days, at the rate of $30 per month, or in the total amount of $4,054, on the theory that such services were rendered by her in reliance upon the alleged agreement made by her father with Mr. Crotty at the time of her marriage, and hereinbefore referred to, to the effect that "when we got through with the place the place was to be Annie's."

Mr. Crotty and another witness testified to statements made by Mr. Mullen at various times confirming his intention to leave the property to Mrs. Crotty after his death, in compensation for her services.

It is settled that a parol agreement of this character, because of the situation and relation of the parties to it, and the consequent opportunity for the perpetration of fraud, is regarded with suspicion, and, when its enforcement is sought, is subjected to close scrutiny. It must not only be material, but also definite and certain, both in its terms and as to its subject-matter, and it must also be clearly proved. *Vreeland* v. *Vreeland, 53 N. J. Eq. 387.* See, also, *Van Horn* v. *Demarest, 76 N. J. Eq. 386* (at *p. 389*). And, in the case last cited, it was held that a declaration of testamentary inten-

tions and purposes, even when the beneficiary of those intentions and purposes acts upon such declarations to his injury, does not necessarily constitute a contract; the lure of a legacy is often held out to attract attention and service, and personal attention and services are often assiduously rendered in the hope of a legacy. Applying the test laid down in these cases as to the character of testimony sufficient to establish a contract to the case under consideration, it would seem that it has not been met. The only testimony concerning the alleged contract, or even as to the statements of Mr. Mullen so strongly relied upon, that "Annie would have the property after my death," come from three witnesses. Mrs. Crotty, whose testimony is incompetent, and, therefore, must be disregarded (*Smith v. Burnet, 34 N. J. Eq. 219; affirmed, 35 N. J. Eq. 314; In re Atkinson's Estate, 86 N. J. Eq. 173*): Mr. Crotty, her husband, whose interest is obvious, and Helen Erben, a niece of the Crottys, who resides with them, who, at the time of testifying, was eighteen years of age, and whose testimony related to a conversation which she heard while she was twelve years of age. After Mr. Mullen's death a bill in chancery was filed by Mrs. Mullen, his widow, to partition the property among his heirs-at-law, although, upon what theory, it does not appear; and, upon her death, Mrs. Crotty was substituted as complainant. We have here the picture of a person claiming to have a contract with her father whereby he was to leave property to her at his death, going into the court of chancery and filing her bill, in which she recites that her father died intestate as to the property in question, and that each of her brothers and sisters have an undivided interest therein, a position absolutely inconsistent with her claim under the contract. I am forced, therefore, to the conclusion that no contractual relations existed between Mrs. Crotty and her father whereby she was to be compensated for caring for her mother.

Ordinarily, where services are rendered voluntarily and accepted, the law will imply a promise upon the part of the recipient to pay for them, but where the services are rendered by members of a family, living as one household, there

will be no such implication from their mere rendition and acceptance. In order to recover for such services, the claimant must show either that an express contract for remuneration existed, or that the circumstances under which the services were rendered were such as to show a reasonable and proper expectation that there would·be compensation. *Disbrow* v. *Durand, 54 N. J. Law 343.* Proof both of the services and of the family relations leaves the case in equipoise, from which the claimant must remove it or fail. *Disbrow* v. *Durand, supra.*

There is not sufficient in the testimony to warrant the conclusion that there was an expectation on the part of Mrs. Crotty to be compensated for her services, and also an intention on the part of Mr. Mullen, her father, to pay for those services, although there appeared to be an understanding by at least some of the members of the family that Mrs. Crotty was to be compensated for her services, which were admittedly rendered. In the case of *DeCamp* v. *Wilson, 31 N. J. Eq. 656,* however, it was held that where a daughter rendered to an old and helpless mother services which, if not rendered by her, must have been obtained from a stranger for compensation, a presumption will arise that she was to be paid for such services. Mrs. Crotty unquestionably rendered to Mrs. Mullen indispensable services for a certain period of time. As has already been said, the evidence is in hopeless conflict as to both the time and the extent of these services, but there can be no doubt that, for the last two years of her mother's life, Mrs. Crotty's services were indispensable, and I think that, upon the whole, the sum of $1,500 will compensate her for her services.

There is another transaction objected to, and, while an exception was not taken as to it, still the case was heard and argued as though there had been, and the matter should therefore be considered. At one time there was living with the Mullens a sister of Mrs. Mullen, referred to in the testimony as "Aunt Tilda," who was boarding with the Mullens. It appears she had some means. There is testimony that she at one time made a present to Mrs. Crotty of $1,000, as well

as other gifts of lesser amounts. There was a mortgage on Mullen house of $2,500, and "Aunt Tilda," from an apparent desire to remove the burden of this mortgage from the property owned by her sister's husband, obtained from Philadelphia a check for $2,500, payable to the order of James Mullen, with which check he paid off the mortgage in question. On the part of the accountant, it is contended that the real reason why this mortgage was paid was because "Aunt Tilda" wanted to do something for Mrs. Crotty, and that inasmuch as she (Mrs. Crotty) was to have the property upon the death of Mr. Mullen, by paying off this mortgage she was really making a present of the money to Mrs. Crotty, and that the estate should therefore be charged with the said sum of $2,500 as money received by Mr. Mullen for the use of Mrs. Crotty. I do not think this contention is sustained by the testimony. The surrounding circumstances of the entire transaction show a gift from "Aunt Tilda" to her sister's husband, by which the sister would benefit, rather than to Mrs. Crotty.

There is still another exception to be considered. Mrs. Crotty claims allowance in her account for "the sum of $600 as money paid to said James Mullen, deceased, in 1910, for the use of the said Annie Crotty with which to buy for her two lots, but which he converted to his own use." The transaction to which this refers is clearly pictured by the testimony of James Mullen, Jr.. He says that upon a certain occasion he was standing in the kitchen of his father's home,, and his Aunt Tilda was in the dining-room looking out of the window at the lots adjoining the Mullen home, and that she asked Mr. Mullen why it was that he did not plant the garden any more. Mr. Mullen said that he could not use the lots any more because the property had been sold. The aunt then said: James, it would be a terrible thing if anybody built on that lot and shut off your sunlight." She instructed Mullen to ascertain how much it would cost to buy the lots, and told him that she would give him the money, no matter how much it was. The result of this conversation was that a check was procured, again from Philadelphia, to the order

of James Mullen, who purchased the lots in his own name. The claim of accountant in regard to this transaction is similar to that concerning the paying off of the $2,500 mortgage, or, in other words, that the payment was made by "Aunt Tilda" for her benefit, because she was to have the entire property upon her father's death. All the testimony in regard to this transaction is in extreme confusion, the only clear-cut testimony being that given by James Mullen, Jr., whose testimony is perfectly straightforward and may be relied upon; and Mrs. Crotty's claim is completely disposed of by that portion of his testimony in which he says that "Aunt Tilda" said to Mr. Mullen, in his presence, that "I gave you that money so you could easily get those lots and enjoy it as long as you live, and, after you are gone, I don't care what your family does with it." This exception will be sustained.

A decree will be advised in accordance with the foregoing.